# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 10, 2016 Session

## MICAH SEAMUS REYNOLDS, ET AL. v. BETHANY RICH, ET AL.

### Appeal from the Circuit Court for Carter County
### No. C13363     Thomas J. Seeley, Jr., Judge

---

### No. E2015-01245-COA-R3-CV – Filed July 22, 2016

---

Micah Seamus Reynolds ("Plaintiff") and Susan Reynolds[1] sued Ted Rich ("Defendant") and Bethany Rich[2] for negligence after Plaintiff fell while assisting with the installation of a roof on a house. The defendants filed a motion for summary judgment. After a hearing, the Circuit Court for Carter County ("Trial Court") granted the defendants summary judgment after finding and holding, *inter alia*, that "[t]he record fails to show any evidence of a violation of any duty to [Plaintiff] that [defendants] owed to him . . . ." Plaintiffs appeal to this Court. We find and hold that the defendants owed a duty to Plaintiff and that there are genuine disputed issues of material fact regarding whether defendants breached this duty. As such, summary judgment was granted improperly. We, therefore, reverse the grant of summary judgment and remand this case to the Trial Court for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed
### Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

---

[1] Micah Seamus Reynolds is the plaintiff who fell off the roof. Susan Reynolds is his wife. Although both Micah Seamus Reynolds and Susan Reynolds are plaintiffs and appellants in this case, we refer in this Opinion to Micah Seamus Reynolds as "Plaintiff" in the singular solely for ease of reading.

[2] Micah Seamus Reynolds and Bethany Rich did not meet until after this suit was filed. Bethany Rich was not involved in installing the roof from which Micah Seamus Reynolds fell, nor was she present on the day of the accident. As such, for ease of reading only, we refer in this Opinion to Ted Rich as "Defendant" in the singular with the understanding that both Ted Rich and Bethany Rich are defendants in this suit.

F. Braxton Terry, Morristown, Tennessee, and W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellants, Micah Seamus Reynolds and Susan Reynolds.

Thomas L. Kilday, Greeneville, Tennessee, for the appellees, Ted Rich and Bethany Rich.

## OPINION

## Background

Defendant Ted Rich was building a house for his daughter, defendant Bethany Rich. Plaintiff agreed to assist with the installation of a metal roof on this house. During the installation, Plaintiff fell from the roof and suffered serious injuries including skull fractures, a broken neck, a fractured cervical vertebra, broken ribs that collapsed his lung, nerve damage to the right side of his face, a shattered elbow, and injury to the fingers of his left hand. The record reveals that no one, including Plaintiff, knows why he fell. Plaintiff remembers waking up in Quillen Rehab "[m]aybe a couple weeks later." Plaintiff had been transferred to Quillen Rehab from the medical center ten days after he fell from the roof. Plaintiff and his wife sued defendants alleging negligence.

The defendants filed a motion for summary judgment supported by, among other things, the affidavit of Ted Rich, which states, in pertinent part:

> 1. My name is Ted Rich. I am 63 years old, reside in Carter County, Tennessee and at all relevant times have been employed as the facilities manager for Chiltern International.
> 2. I have received no formal education or training and have had no employment experience in construction.
> 3. My wife and I deeded a 3.42 acre parcel of property to our daughter, Bethany Rich, in 2009 upon which to construct a home. Neither my wife nor I retained any ownership or other interest in the property from and after that time. It was upon this property deeded to our daughter where [Plaintiff's] injury occurred on September 14, 2013.
> 4. I offered to assist my daughter in the construction of her home in view of her limited budget. In order to fund the construction of her home my daughter obtained a construction loan for which she was receiving periodic draws as the construction continued. My daughter is the sole obligor on the loan which was secured by her giving a deed of trust on her property.

2

5. I performed as much of the work on my daughter's house as I could. Some of the labor was carried out by hired subcontractors, such as the foundation and block work, while some of the work was carried out by friends and family members, including from our church, who volunteered to assist.

6. I have known [Plaintiff] for a number of years, having become acquainted with him through mine and his employment with Chiltern International. From time to time [Plaintiff] and I would talk about matters, including him having re-roofed his own house using metal roofing prior to the time when the roof was installed on my daughter's house. [Plaintiff] offered to assist in the construction of my daughter's house.

7. When the time came to install the metal roofing on my daughter's house I asked [Plaintiff] if he would like to help in view of his prior experience in installing such roofing on his own residence, and he agreed.

8. [Plaintiff] had been to my house on a previous occasion when he had borrowed equipment from me during which time we walked over to my daughter's house which was under construction and which was within sight of my own residence. On that occasion the framing had been completed on the house but the roofing materials were not yet being applied.

9. On the date of [Plaintiff's] September 14, 2013 injury there were a total of seven men working on my daughter's house, including me and [Plaintiff]. All of them were friends and acquaintances of mine, some of whom were from my church, and all of them were known to me as healthy, able-bodied, intelligent, adult men.

10. Everyone assisting in doing the roofing work to my daughter's home on the date of [Plaintiff's] injury were [sic] working as unpaid volunteers with the exception of one person who was being paid, being a person whom I knew had experience in installing metal roofing, who was paid.

11. At no time prior to and at the time of [Plaintiff's] fall did I know of, or was I told of, any danger or risk involved in the work that was being done other than the obvious fact that whenever one is on any surface above the level of the ground one could be injured upon falling to the ground.

12. Before the start of the roofing work on September 14, 2013 I asked all of the volunteers in attendance, including [Plaintiff], if any of them had any reluctance or problem in going up on and working on the roof and none of them, including [Plaintiff], voiced any concerns or reservations.

13. During the course of the work I had gloves available for the volunteers to wear if they desired and offered a pair of gloves to [Plaintiff], who declined them.

3

14. The sheets of metal roofing were being fastened to the roof which was covered with roofing felt. In installing the sections of metal sheeting one could stand with both feet on the felt surface while reaching over and drilling the screws into the metal sheets. All of those fastening the metal sheets were standing on the felt roof and not on the metal with the exception of [Plaintiff] who was the only one who was standing on the metal while fastening the metal sheets. I told [Plaintiff] that I thought it would be better if he stood on the felt, like the other men, instead of on the metal when fastening the metal sheets, however [Plaintiff] said that the shoes that he was wearing provided him good traction on the metal.

15. Prior to and during the time of his work on September 14, 2013 [Plaintiff] did not request any assistance, tools, equipment, harness, rope, scaffold, support, any type of restraint or anything else.

16. I do not know what caused [Plaintiff] to fall off the roof. I saw him at the edge of the roof as he was in the course of falling off but did not see why or what caused him to fall. No one on the roof that day, including [Plaintiff], has been able to identify what caused [Plaintiff] to fall off the roof. No one else slipped or fell while installing the metal roofing that day or at any time.

During his deposition, Plaintiff testified that Defendant never gave Plaintiff instructions or directions on how to install the roof. No one else gave Plaintiff instructions with regard to the roofing on the day of the accident. Plaintiff agreed that he made the decision about how to perform the work he was doing.

Plaintiff explained that when he previously had installed a metal roof on his own house he tied himself up with rope, extended the rope across to the other side of the roof, and anchored the rope to a riding lawnmower while he worked on the roof. Plaintiff testified that he never asked Defendant or anyone else on the scene for any equipment. While at the scene of the accident, Plaintiff never asked to be secured with rope or a harness. When asked if he felt unsafe on the roof prior to his fall, Plaintiff stated:

No. I remember there was a piece of foam in between like the framework that when I stepped on it it kind of shifted but I can't say that that made me feel unsafe really. . . . I just knew not to step on the foam, you know, stay on the wood frame as I made my way over to the other side.

Plaintiff opposed the motion for summary judgment and filed an affidavit of William "Reece" Milton, which states:

4

1. My name is William "Reece" Milton.

2. I have worked in the construction industry since approximately 1986.

3. During that time I have worked for a family business, Milton Development Corporation, overseeing the construction and marketing of single and multi-housing and small commercial business structures.

4. I was an owner and president of Custom Crafted Homes, Inc. where I oversaw construction of custom offsite homes.

5. I worked at Custom Crafted Construction, Inc. where I oversaw construction of custom homes and commercial businesses throughout East Tennessee.

6. I am currently an owner and Chief Operating Officer of Global Building Contractors, LLC where I direct all operations of the company throughout the Eastern United States while holding several different state licenses.

7. I am familiar with building code requirements involved in putting traditional and metal roofs on homes and commercial buildings.

8. I am familiar with the necessary OSHA safety precautions which need to be undertaken in putting traditional and metal roofs on homes.

9. I have reviewed the following:
   a. The deposition of [Plaintiff];
   b. The deposition of [Defendant];
   c. The deposition of Bethany Rich;
   d. The affidavit of [Defendant];
   e. The affidavit of Beth [sic] Rich;
   f. [Plaintiff's] Answers to Defendants' Interrogatories and Request for Production of Documents;
   g. Response of Defendants Bethany Rich and Ted Rich to Interrogatories and Request for Production of Documents Propounded by Plaintiffs; and,
   h. Amended Response of Defendants Bethany Rich and Ted Rich to Interrogatories and Request for Production of Documents Propounded by Plaintiffs;

and I can offer the following opinions within a reasonable degree of certainty based on my experience in the construction industry.

10. [Defendant] had undertaken to construct the home in question and essentially acted as the general contractor.

11. As such, [Defendant] was responsible for the safety of the persons entering the site and working on the home.

12. [Defendant] was also responsible for evaluating and making sure that persons involved in the construction of the home were qualified to do those jobs safely.

13. It doesn't appear that [Defendant] had available appropriate safety controls for the job site in question, including safety devices.

14. [Defendant] did not properly evaluate or train the individuals in the manner in which to install this metal roof safely.

15. It would not have been safe for [Plaintiff] or others not experienced to work on the metal roof in question.

16. I have contracted work with subcontractors on commercial buildings that metal roofing is installed on a regular basis.

17. Metal roofing is very slippery. It is not like asphalt singles, which provide a substantial amount of traction even with regular work boots or tennis shoes/sneakers. Even the plywood decking and the roofing felt on top of the plywood decking that go under metal roofing or shingles does not provide enough traction to work without a restraining device or safety device in place. OSHA guidelines detail exact safety precautions and guidelines to prevent such incidents.

18. I do not allow installers to install metal roofing without safety devices for themselves or the sub-contractors [sic] workers installing metal roofing.

19. I would never recommend to a private person acting as their own builder to install a metal roof without some type of safety device or restraining device.

20. It is not safe to install or work on a metal roof without safety devices of some kind. Metal roofing is too slippery to work on without restraining devices or safety devices being in place.

21. It is not safe to work on a metal roof without a restraining device.

22. I have looked at excerpts of the deposition of [Plaintiff] and [Defendant] and I cannot see that either Brittany [sic] Rich, the landowner, or [Defendant], who was supervising the installation of the metal roof at the home of Brittany [sic] Rich, provided any kind of safety or restraining device to anyone who was helping with the installation of the metal roof at the home of Brittany [sic] Rich.

23. I cannot see that any safety meetings were held demonstrating or discussing the possible dangers of the particular job.

24. I would like to offer that in the State of Tennessee contractor registration verification is part of the permitting process. All contractors are required to carry workers [sic] compensation. All contractors or "Prime Contractors" typically verify that the subcontractors performing the work are

insured. If they are not, then the Contractor "Prime" is responsible for that subcontractor or anyone working on the job. Page 54 line 16 reads that [Defendant] offered [Plaintiff] to come to work. Though [Defendant] offered gloves and some precaution it is his responsibility to insure the safety of all individuals throughout the entire project at all times. Hiring cheap labor or unqualified labor does not except you from responsibilities of individuals working on your project.

25. Pursuant to T.C.A. § 62-6-103, an owner of property may construct a single residence once every two (2) years, for their own use, and not for resale, lease or rent. Anyone hired by the homeowner would be considered a prime contractor or a construction manager, and they are not exempt from the license. The homeowner is responsible for workers [sic] compensation insurance and general liability insurance.

26. Based on the above, I conclude that [Defendant] and Bethany Rich, as owner, were negligent in failing to appropriately train, supervise and provide appropriate safety equipment for [Plaintiff].

After a hearing, the Trial Court entered its order on May 29, 2015 granting summary judgment to defendants after finding and holding:

1. [Defendant] did not occupy the position of a contractor as provided for by T.C.A. § 62-6-103;
2. [Plaintiff] was a volunteer worker and not an employee of either Bethany Rich or [Defendant] at the time of his subject injury;
3. [Plaintiff] chose his own methods by which he undertook his volunteer work on the roof;
4. [Plaintiff] had prior experience applying metal roofing of the same kind and in the same manner when he had roofed his own residence;
5. The record is silent as to how, or why, [Plaintiff] fell off the roof. It would be speculation to express an opinion as to how [Plaintiff's] accident occurred inasmuch as even [Plaintiff] does not know;
6. The record fails to show any evidence of a violation of any duty to [Plaintiff] that either Bethany Rich or [Defendant] owed to him; and
7. [Plaintiff] had a duty to exercise reasonable care for his own safety. The Court cannot find that the defendants violated any duty to the plaintiffs.

From all of the foregoing there is no genuine issue as to any material fact and the defendants, Bethany Rich and [Defendant], are entitled to judgment of dismissal of the Complaint as a matter of law.

7

Plaintiffs appeal the grant of summary judgment to this Court.

## Discussion

Although not stated exactly as such, plaintiffs raise one overall issue on appeal: whether the Trial Court erred in granting summary judgment to defendants after finding that defendants did not breach a duty to Plaintiff. Defendants raise an issue with regard to whether they also are entitled to summary judgment based upon Plaintiff's comparative fault.

As our Supreme Court has instructed:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (*citing Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

* * *

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary

judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

With regard to negligence, our Supreme Court has explained:

As we have frequently observed, a negligence claim requires a plaintiff to prove the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation. *See, e.g., Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). The duty element is a question of law requiring the court to determine "whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Id.* at 870 (quoting W. Page Keeton, *Prosser & Keeton on Torts*, § 37 at 236 (5th ed.1984)). Appellate review of a question of law is de novo. *Bradshaw*, 854 S.W.2d at 870.

In analyzing duty, the court must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm. *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 902 (Tenn. 1996). A "risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

In a premises liability case, an owner or occupier of premises has a duty to exercise reasonable care with regard to social guests or business invitees on the premises. The duty includes the responsibility to remove or warn against latent or hidden dangerous conditions on the premises of which one was aware or should have been aware through the exercise of reasonable diligence. *See Blair v. Campbell*, 924 S.W.2d 75, 76 (Tenn. 1996); *Eaton v. McLain*, 891 S.W.2d 587, 593–94 (Tenn. 1994). Although the traditional rationale for imposing this duty was the owner's superior knowledge of conditions on the premises, *see e.g., Kendall Oil v. Payne*, 41 Tenn. App. 201, 293 S.W.2d 40, 42 (Tenn. App. 1955), we recently held that a duty may exist even where the injury-causing condition is alleged to be "open and obvious" to the plaintiff. We explained:

> That a danger to the plaintiff was 'open or obvious' does not, *ipso facto*, relieve a defendant of a duty of care. Instead, the duty issue must be analyzed with regard to foreseeability and gravity of harm, and the feasibility and availability of alternative conduct that would have prevented the harm. The factors provided in the Restatement (Second) of Torts, § 343(A) relate directly to the foreseeability question; in short, if the foreseeability and gravity of harm posed from a defendant's conduct, even if 'open and obvious,' outweighed the burden on the defendant to engage in alternative conduct to avoid the harm, there is a duty to act with reasonable care.

*Coln v. City of Savannah*, 966 S.W.2d 34, 43 (Tenn. 1998).

The duty imposed on the premises owner or occupier, however, does not include the responsibility to remove or warn against "conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable

10

care." *Prosser and Keeton on Torts*, supra, § 61 at 426. In this regard, "the mere existence of a defect or danger is generally insufficient to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it." *Id*. at 426–27. As we explained in *Doe v. Linder Const. Co*., 845 S.W.2d 173, 178 (Tenn. 1992):

> Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability. '[T]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, *and that some action within the [defendant's] power more probably than not would have prevented the injury*.'

(emphasis added) (citations omitted).

*Rice v. Sabir*, 979 S.W.2d 305, 308-09 (Tenn. 1998) (footnote omitted).

Defendants argue in their brief on appeal that they did not owe a duty to Plaintiff "inasmuch as every volunteer present at the construction site possessed a duty to exercise reasonable care to avoid injury to another." While we agree that the volunteers had a duty to exercise reasonable care to avoid injury to themselves and each other, this in no way means that defendants did not owe a duty to Plaintiff.

In the case now before us, it is clear that the reasonably foreseeable probability and gravity of harm from a possible fall while installing a roof outweighs the burden upon defendants to engage in alternative conduct which would prevent such a risk of harm. Thus, defendants' use of volunteers to install the roof gave rise to a duty for defendants to act with reasonable care. We, therefore, hold that defendants did owe a duty to Plaintiff.

Turning to the issue of whether the duty that defendants owed to Plaintiff was breached, and viewing the evidence in the light most favorable to Plaintiff, as we must at this summary judgment stage of the proceedings, we note that there are genuine disputed issues of material fact regarding whether defendants breached the duty they owed to Plaintiff. There are genuine disputed issues regarding whether defendants could have, or should have, taken action other than, or in addition to, what was done, such as providing a safety or restraining device which would have prevented the risk of a fall from the roof.

11

With regard to the issue raised by defendants regarding comparative fault, defendants argue in their brief on appeal that Plaintiff had a duty to exercise reasonable care for his own safety. We agree, but this issue does not end there. As explained in *Staples v. CBL & Assocs., Inc.*:

> In negligence cases, only after the element of duty is established does the comparative fault of the plaintiff come into play. *See Coln v. City of Savannah*, 966 S.W.2d [34] at 42 [(Tenn. 1998)]. If the defendant has plead the affirmative defense of the plaintiff's relative fault, the reasonableness of the plaintiff's conduct in confronting a risk should be determined under the principles of comparative fault. *See Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994). If the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that her fault was equal to or great [sic] than that of the defendants, summary judgment in the defendant's favor may be granted. *See Coln v. City of Savannah*, 966 S.W.2d at 44.

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 91–92 (Tenn. 2000).

Viewing the evidence in the light most favorable to plaintiffs, again as we must at this summary judgment stage, we cannot say that a rational trier of fact could not find that the percentage of fault attributable to Plaintiff was less than 50%. As such, there are genuine disputed issues of material fact with regard to comparative fault in this case, making summary judgment inappropriate.

As there are genuine disputed issues of material fact with regard to whether defendants breached the duty they owed to Plaintiff and genuine disputed issues of material fact as to comparative fault, summary judgment was granted improperly. We, therefore, reverse the grant of summary judgment and remand this case to the Trial Court for further proceedings consistent with this Opinion.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings. The costs on appeal are assessed against the appellees, Ted Rich and Bethany Rich.

_____
D. MICHAEL SWINEY, CHIEF JUDGE